Good morning, your honor. May it please the court. Good morning, Ms. Messmer. I'm Shelly Mackel. I represent the city of Des Moines and officers Ryan Garrett, Brian Minahan, and Ryan Steinkamp. And the issues before the court today are the constitutionality of a traffic stop of Jared Clinton and the qualified immunity as to the officers and the summary judgment that was entered in the district court below. On October 3rd, 2019, these three officers were working a special assignment called SET, which is Summer Enforcement Team, and that focuses on high crime areas in Des Moines to address gun and gang violence. So they were parked in an area that had multiple shootings and weapon recoveries in recent history. And Jared Clinton first caught their attention when he drove by and they noticed that he was driving without a front license plate. And then as the car was driving by the police vehicle, the passenger vehicle or the passenger in the vehicle sat up very abruptly, took visible notice of the law enforcement officers, stared at them, and then abruptly sat back down in his seat. So because the officers are trained in noticing this kind of behavior, it caught their attention. And so they began to follow the vehicle. Once they got behind the vehicle, they noticed that there was a piece of paper in the back window. However, they were unable to tell if the piece of paper was an actual paper tag or if it was a blank piece of paper. So because they were unable to discern that, the officers pulled this vehicle over. Now, the perception about the piece of paper is not only consistent throughout the officers' reporting and their deposition testimony. It's also consistent and corroborated in the record in the appendix from 15 to 23 and in the video that was submitted with the appendix. It is very difficult to tell if that is a blank piece of paper or if it's an actual registration tag. Why did he use the term, quote, matched up? Because I think that's one of the first thing he says. I want to be sure the temporary tag is matched up. I believe what that refers to is that they wanted to, because they couldn't see it initially, when they were able to get to the tag and take a look at it and verify that it was an actual tag, that they wanted to match it with the VIN that would be on the front of the car. Because I believe the video demonstrates that Officer Steinkamp was on that side of the vehicle. And so I believe that that's what that is referencing, although it isn't entirely clear from the record what that reference is. Does that answer your question, Your Honor? Sure. Okay. Counsel, that sounds more like they were fairly convinced it was a tag, but that the tag might indicate that the vehicle was not the vehicle that the tag was connected to and that the car might not be lawfully possessed. Well, I believe that when the stop was initially made, the concern when they can't even see if it's a blank piece of paper is the issue that raises the reasonable suspicion. And then when they actually get to look at the tag, which they have to do by standing right behind it, that that's the point at which they want to verify that the tag is correct, because it's suspicious to have a tag that does not appear to be clearly displayed. And that, indeed, is what the case law seems to suggest, is that if you cannot discern that it's a paper tag, then that investigation can continue. And I think that's clear in the Eighth Circuit law, and I think it's clear in Iowa law as well. And so when the officers made this stop, because they couldn't even discern that this was a paper tag, it could have just been a blank piece of paper, they step up. The immediate action is to check the tag to do that verification. But in that same moment is when Brian Garrett is at the window explaining the reason for the stop and smells marijuana. So this is happening simultaneously. He also sees marijuana on Jared Clinton's person, and Jared Clinton admitted during depositions that he had smoked leaf marijuana earlier in the day. So that is the point at which the stop is prolonged. The passengers and the driver are detained, and a search of the vehicle is done. And at the point of the search of the vehicle, they do find marijuana vape cartridges, and Jared Clinton is ultimately charged with possession. Those charges were ultimately dismissed. So, you know, the questions before us today are whether or not the stop was supported by reasonable suspicion. And if not, was the law clearly established to the degree that only an incompetent would have made the stop? Now, Iowa law requires that temporary tags be stamped and stenciled with certain information about the seller and the date of transfer. The Iowa DOT regulations require drivers to show proof of ownership to law enforcement if they're using a temporary tag. And the officers in this case had particularized objective facts that formed that reasonable suspicion. There was no front license plate. There was something that looked like a blank piece of paper in the back window. They had the physical reaction of the passenger, and they have the presence in the high crime area. When you say about the front license plate, you're saying that they saw that there were no front license plates? Yes, that was their initial view, was seeing his car come at them sideways. So they noted the lack of front license plate. Then they saw the reaction of the passenger, which really got their attention. And then once they followed, they couldn't verify that that was even a paper tag in the back window. Well, and didn't, as I understood the testimony from the officers, they said that they just stopped to check to see it to verify if it was a valid tag. That's right. They stopped to see if they could actually identify that it was a valid tag. And then the district court found that it was clearly established that that is not sufficient to pull someone over. Is that a fair sum up? It is a fair sum up. Are you arguing that there was more? I guess I'm trying to get at your argument. Are you arguing both prong one and prong two? Are you saying that there was more than what the officers said they were doing? I'm right now arguing prong one in that this is a constitutional stop, that this was enough for reasonable suspicion. And I would say that even absent the behaviors of the passenger and the placement in the high crime area, that the 8th Circuit cases permit this stop. So, Counselor, is it your view that people who drive in high crime areas are subject to a reduced protection under the Fourth Amendment? Absolutely not. I'm saying that that is a factor that can be considered and has been considered in other cases. That alone would never be enough for reasonable suspicion. It is simply one factor that fed into what was already enough for reasonable suspicion. And the cases, in terms of at least the 8th Circuit cases, suggest that this is exactly the kind of case where this is okay for officers to pull folks over. You have the four cases, the Sanchez, Mendoza, Givens, and McLemore cases. In Sanchez, the officer couldn't read. Counselor, your time is short. Would you start with McLemore? I will. So, McLemore is a very different situation than the three other cases as well. Because those all had cases where they had trouble even discerning that it's a paper tag, much like our case. In McLemore, the officer was looking for a reason, any reason at all, to stop this vehicle and says to another colleague, well, there's a paper tag. I can't make out everything on it. And they say, boom, that's enough. That's great. And the record showed that the officer in McLemore didn't care about the tag. She walked right by it and said, I have no concern about the tag whatsoever. That was just my hook. And so, of course, in that case, this court drew a line in the sand and said, that's not enough. You can't just, you know, pull this out of whole cloth because you can't make out every word on a paper tag. And then went back and cited Sanchez, Mendoza and Givens for proper stops. So what part then did the look of the occupant play in creating probable cause for a stop or a reasonable suspicion for investigating the tag? It simply bolstered the reasonable suspicion that there was some crime being committed. We don't need that as part of this because the McLemore case actually sets out a test and it asks three questions. It asked, well, we mentioned it because you did. Right. But I'm just saying that our officers had more. And that really goes to the clearly established prong is, you know, we have cases about paper stops, but we don't have cases with paper stops that also have sort of this furtive movement added to it. And so it's an addition that our officers would not necessarily know by looking at the case law. But as to the McLemore test, what was asked was, well, what was it the officer couldn't see? Was there something that the officer actually articulates they couldn't see? Was there evidence of that deficiency? And third, is there evidence that these normally can or can't be read? And in the McLemore case, the reason that officer failed that test was because she couldn't articulate what it was she couldn't see. There's nothing in the record about what it was that she was missing. There was no evidence of a deficiency with the tag. And then third, she said, no, I oftentimes I can't see these things. So it's nothing unusual. Well, we have the opposite situation in this case. Our officers could see nothing on the tag. They couldn't even discern whether or not it was a blank piece of paper. The second, was there evidence of that? Well, I'd point you back to the appendix pages at 15 to 23, where it demonstrates you can't see if it's a blank piece of paper or a tag. I have a question about that. Is there is there a difference between at the angle that they were at saying, well, I couldn't I couldn't see if it was blank versus I had no reason to even suggest that it might be fraudulent. I just couldn't see it from where I was. Is that an important distinction? Well, not according to to the case law, because case law even says if I can't tell that there was a paper tag in the window, if I can't make out that it's a. So, for example, Sanchez, if I can't make out that it the words that trigger for me that it's a tag, then that's OK. In the same same kinds of scenarios in Mendoza and Givens, I just couldn't make out that it was a tag. That's really the critical question is, can you even discern that it's a paper tag? And that goes to that third question in McLemore, which was, did these officers say that it's normal that they can see a tag? And they did. They said Steinkamp said, yeah, I see these things every day. They're easy to see. So did Minahan. And even Jared Clinton's own expert said these tags are usually easy to see and to discern what they are. And so the absence of being able to to to see that and to just be able to identify that it's a tag is an unusual circumstance enough that allows for this stop to be supported by reasonable suspicion and did not allow for the McLemore stop to be supported by reasonable suspicion. Now, I see I've I'm already deep into my rebuttal time. So with absent other questions, I'll go ahead and reserve now. All right. Thank you, counsel. Miss Messimer. Thank you, Your Honor's counsel. There are quite a few cases, both state and federal on paper tag stops. And from those cases, a clear line emerges on the unconstitutional side of the line are cases where an officer simply can't see what's on the tag and they're stopping to verify the tag. That's the holding of McLemore. Those kind of cases are unconstitutional. The stop in this case falls neatly under the McLemore holding. And therefore, this stop was unconstitutional as well on appeal. Let me ask you about a factual point. As you know, the United States Supreme Court has put us other courts in the business of looking at these videos. And if you look at the dash cam video, is it fair to say you can see the tag, but you can't read it? There's glare and the angle of the window. Is that fair? That is fair, Your Honor. OK, so that doesn't make that like more like Mendoza, Sanchez and Gibbons. No, Your Honor. And here's why. Again, I think the procedural posture of this is important. We're dealing with district court findings on appeal, and we have to accept those findings to know both there or we have to accept those findings that they're supported here. The district court talked about all the facts recognize that the video doesn't clearly show that you can read it. But then when you look at the officer's testimony, these officers were asked specifically about what could they see on that tag? And was there anything that gave them an affirmative reason to think it was fraudulent or could they just not see it? And that's where this case really came down to it for the district court. Taking the light, the facts in the light was favorable to the officers. These officers admitted they made this stop strictly because they could not see what was on the tag, not because there was some affirmative thought in their mind that it was fraudulent. It was a stop just to verify. Counsel, I thought that was now tell me I don't get it. Maybe I thought that was the fact of Gibbons. Officer sees, quote, what appears to be a paper registration card in the rear window, unquote, but quote, cannot read it due to angle of window and not this. It seems to me the same as window and glare here. So tell me how that doesn't make it the same as Gibbons. The distinction between this case and Gibbons is the same as the distinction between Gibbons and McLemore, which McLemore recognized explicitly and talked about in that case. The difference between Gibbons is that the officer there testified. Normally, I'm able to see this kind of tag. And so the fact that I couldn't read it indicated to me it was fraudulent. The testimony in this case from all three officers is the exact opposite. And I take issue with opposing counsel's recitation of the facts there. These officers testified they cannot always read tags, that it's normal. They cannot read them. It depends on the glare. Officer Garrett said it's hard to read tags. And another point in his testimony, he said that simply because he can't see what's on it, he can't assume it's blank. These officers all recognize me not being able to read it does not mean at all that it's somehow illegal. So that's what the difference between Gibbons. And that's the exact same thing that McLemore discussed in that case. There wasn't any officer testimony in McLemore saying I expected to be able to see something here. It was just I didn't see it, and therefore I stopped it. Counsel, again, I got to tell you, Gibbons. Now, this isn't a quote, but my notes on Gibson says the officer had experience with fraudulent tags, had been able to read them in the past, but couldn't do this one. So so help me. Yes. So the difference here is that the officers in our case testified they can't always read tags versus Gibbons said I expected to be able to read this. Our officers did not testify. I expected to be able to read this tag. And that's the same. So in McLemore, they talk about and Gibbons officer testified that he typically could read temporary tags at night. And that's how they distinguished McLemore. Same thing here. And to kind of pull back a little. Well, now, when you look at these four cases now, I'm going to skip to clearly established. When you look at these four cases and and I didn't realize that the actual training bulletin had both McLemore and Gibbons in the same training bulletin that was given to police. I didn't realize it was on the same. I think it's same sheet of paper. Appendix 177, 178. And when you look at those two being beside each other, my goodness gracious. Does that is that clearly established? It looks to me like it's clearly unestablished reading what was on the training bulletin. And then in comes the, of course, assistant Polk County attorney for what he said. So so how do you get to clearly established? I would say it's clearly established for me. The bright line is on one side of the line. The unconstitutional side is here's an officer who just can't read what's on a tag on the constitutional side of the line is here's an officer. Who should be able to read something and isn't able to read it. Or here's an officer that see something on the tag that indicates for whatever reason it's fraudulent or it doesn't comport with the local statute. Like if it has different lines or weird colors or something like that. Here we're on the McLemore side where it's just simply because their failure to read it. And that's kind of in line with these officers all said they thought they could do. They thought anytime I see a paper tag, I can stop and check it. That's not right. But exactly what they did here is exactly what they thought they could do. And to me, in terms of the lobbying clearly established, I mean, we've got McLemore. I think the holding is very clear. It distinguishes all the other cases along this line that I've said. So I don't know. I think for the court to say the law is not clearly established, they've got to say McLemore isn't clear. And I do think it is clear. And I know that the bulletin is not somehow binding authority by any means. But I think it's significant that both this bulletin from the Des Moines city attorney and then later the e-mails that were exchanged between the officers and the Polk County attorney Levi Grove, both Levi Grove and the city attorney got this issue exactly right. They recognize McLemore says you can't make a stop if you're just doing it because you can't read a tag and you want to check it. But besides here, what I'm arguing about is I think whether I should win summary judgment, but I'd like to pull back here. I think worst case scenario, there's a fact question for a jury because these officers testified they couldn't read the tag. There's absolutely a fact question about whether they could read the tag or not. I recognize the video from their dash cam. You can't make it out the video, but there's evidence in the record, pictures of the tag showing it's clearly filled out in black marker. The video shows it's a sunny day, but it's overcast. They also drive under a bridge. There's lots of lighting variations that would have given these officers an opportunity to see this tag and make out what's on it. So whether these officers are credible about the fact they couldn't make anything out on this tag, that's a question for the jury. There's also an affidavit in the record from my client's mother who followed him home from the dealership and could see the tag. And she's the one who took the pictures afterwards and could see the tag from a ways back. It's not like this. There's nothing special about this on a sunny day that these officers shouldn't have been able to see it. So that's a credibility question for the jury. Even with the dash cam, even with the dash cam video on the dash cam video. Now, of course, I'm not a very attentive viewer, but it looks to me like seen but not read because there is glare and there is an angle. I agree. That's what the video captures. But the video is not what these officers would have seen. Exactly. Well, it's awfully close, isn't it, counsel? I mean, it's on the dash cam. They're here. I mean, I don't disagree, but that's going to be a fact question. If if the court were to reverse the grant of summary judgment in my favor, that's going to be a fact question. But again, taking the facts in the light most favorable to these officers, the district court found that the officers admitted they made this stop strictly because they couldn't read the tag, not because there was affirmative evidence that made them think it violated the law. That's the difference, because officers aren't going to always be able to read these tags like they testified. Officer Steinkamp, it's on page 130 of the appendix, 137, 138. Officer Minahan on page 119 of the appendix. They all testified. We can't always read these tags. Officer Guerra on page 97. It's hard to read these tags just because it's hard. That doesn't give them carte blanche to then pull people over because they can't read these. Turning to the other factual issues that the defendant raises on appeal, which, again, the district court considered these facts and didn't find them persuasive. And I think that's binding for this court on appeal. But in terms of this dangerous neighborhood argument, to me, this is a bit of an eye roll because I live in Des Moines and I know this road. I drive it every day. But factually speaking, this is another disputed fact that this is a dangerous neighborhood. For some reason, that matters to this case. It's in my response to their statement of facts. But they're as close to Good Park as they are to four churches and a Polk County services building. And it's a four-lane road that connects up with another four-lane that runs downtown. But what did the district court find? Did the district court make a finding about that period? The district court didn't make a finding, but what the district court found significant... What did the district court say? I'm sorry. You need to help me. What the district court found significant was that there was no nexus between any dangerousness of this area and these three men driving in the car. None of the officers said that they were coming from Good Park or they knew somebody at Good Park. So they're just driving somewhere over there. And the district court specifically recognized none of the officers testified there was a nexus. And they all, to the contrary, acknowledged that wasn't enough to make this stop, even in combination. Same with the passenger looking at the officers. That's not enough, and not even combined, that's not enough to say there was reasonable suspicion here. It doesn't relate to the license plate tag, either one of these two things. And again, I think the final nail in the coffin on those arguments is Nick Lamour. Because in that case, there actually was a lot more background suspiciousness information, I would say. In that case, we have a passenger who got out of the car at a gang-affiliated home. The passenger who got out was gang-affiliated. There had been a shooting two days before. And yet, Nick Lamour said that doesn't matter for the analysis of whether or not you can stop somebody for a paper tag. You just can't make these blanket stops of anybody because they just bought a car and haven't gotten the tags yet. So, and in the district court, again, I know I'm biased, but I think Judge Gritzner's ruling is very thorough. And he talks about each one of these things. And he talks about the fact that Nick Lamour was a more dangerous gang-affiliated background type case. But that did not matter. That does not really factor in or heighten the suspicion when we're talking about a paper tag stop. Well, I usually don't do this, but I'm going to do it with you, which is out-of-circuit authority. It looks to me like the Tenth Circuit, the Fourth Circuit are more in line with Sanchez-Mendoza-Gibbons than Mack Lamour. Is that fair or unfair? Well, I think the out-of-circuit cases, there are some on either side of the line. But I think all the cases do recognize the line in a similar place. In Mack Lamour, the case that was talked about, I think in both Mack Lamour and maybe Sanchez, is United States v. Wilson, which is the Fourth Circuit case. And, oh, it was Gibbons. So in Gibbons, the Eighth Circuit distinguished Wilson. But in Mack Lamour, the Eighth Circuit said this case is exactly in line with Wilson. So I think the out-of-circuit cases kind of fall in a similar division as the Eighth Circuit cases. I don't think that they are telling us something different. Also significant, we have Iowa state court law on this exact issue that is in line with Mack Lamour. Both the case of State v. Hawley, that's a published court of appeals opinion, and then the State v. Carmody, which is an unpublished opinion. But both of those recognize if the sole reason for pulling somebody over is just to check and see, that's not enough for reasonable suspicion. And those are pretty thorough decisions, and they're discussed by Levi Grove, the county attorney, in his email. So, again, in terms of whether it's clearly established, when we've got both Mack Lamour, then the State cases of Hawley and Carmody, on the unconstitutional side of the line, it's pretty fleshed out what's unconstitutional versus what is. And when these officers had specifically been given a training bulletin on that, I think it's hard to say they shouldn't have known, or that they have some exceptional circumstances because a county attorney might have told them something different. Don't you think the cite to Givens and the way it's summarized here is confusing on the training bulletin? Is it or is it not? 177, I could get it, but it'd probably take me two minutes to find it over here. But 177, 178, the quote, at least I have from Givens. So, yes, on page 178, the first paragraph is where that bulletin talks about Givens, and it notes that in Givens, the officer had been able to read other temporary tags at night. And so I think that's the fact that really makes it different. If these officers, none of these officers in their deposition in this case, came in and testified, I actually thought this card was blank. None of them said that. They just said I couldn't tell. And that's not enough because it's not uncommon to not be able to tell what's written on the tag. They didn't pull up beside the car and try to get a better look at it. They just followed it for a little bit and then pulled it over because they thought that's what they could do. But it's unconstitutional and they should have known that. That's the law under both the state of Iowa and the Eighth Circuit. I understand the court's point about Givens. I do think whoever had that officer made a better record, I guess, that he had a little bit more that amounted to reasonable suspicion because he thought that tag was fraudulent because he expected to see something and didn't. But those officers in this case, they explicitly backed away from that. They did not ever make that claim that they expected this tag to show something that it didn't. Counselor, we're entering into a bad area here. Suppose you even win. The officers will now from now on all say, well, I have experience and I see a lot of them. And, you know, when I'm parking, when I'm when we're pulled up to the stop sign or they're parked, of course I read them. And that's the answers you'll get from now on. Are you worried about that at all? That officers will pull up next to people when they're parked? No, no, no. That the officer will now say, I have I have trying to get the right words. I have great experience looking at these and normally I can do it. But this was different. Are you worried that'll be the standard? Because, right, that that that's what you're saying was not present here. That they'll just make a better record next time and say, yeah, correct. Correct. Yeah. That would be a different case, I guess, if somebody wants to coach the officers to say that. Yeah, yeah, yeah. And we expect officers to tell the truth. Yeah. Yeah. Yeah. That would be, again, come down to, I think, a credibility issue. But we're going to find officers credible, especially when there's dash cam to support them. These officers, the summer enforcement team, they make a lot of pretextual stops because they're looking for gang activity. And when you're going to make a pretextual stop, you should know that your pretext is good. And unfortunately, here they got it wrong. So we asked the court to affirm the district court's grant of summary judgment in plaintiff's favor. Thank you. Thank you, Miss Mesmer. All right. Miss Weed-Randers, your rebuttal. Yes, thank you, Your Honor. Just a couple of points. The district court's findings did include findings that the officers could not tell, that it was a blank piece of paper. And that is the crux of our argument. So we don't take issue with the district court's findings of fact. The district court also made the finding that Brian Minahan said he could not read it because of the angle and the glare. So those are part of the accepted findings of fact in this case. And, you know, as summary judgment is that put-up-or-shut-up time, as we read in case law, there's no evidence in the record that that was incorrect, that that was inaccurate. And, in fact, there's corroborative evidence that demonstrates. And it takes McLemore too far to say, if I look at a piece of paper and I think it's blank, that it could be blank, that that officer can't make that stop. It takes McLemore too far, and especially in the context where we have cases where a mistake of fact allows for officers to be considered to have made a reasonable decision to make that stop. So in some of the federal cases, but also in the state cases, which are at least relevant to whether officers should be making these stops or not, we have cases where the officers are making a mistake because they simply couldn't make out the tag. They couldn't make out if it was a tag. Well, how different is that, that I can't make out that it's a blank piece of paper or I can't make out that it's a tag? Counsel, would that be a fact issue for a jury to decide whether the officers could make out the tag? No, because we've already developed our record here. And there is no evidence in the record that these officers were untruthful, that there was any reason to doubt that. And, in fact, there's only corroborative evidence that, indeed, they could not make out whether or not this was a blank tag or not. And so I point out that there's inconsistencies in the state case law as well, merely for the fact that when we look at that second prong, we're supposed to be giving officers a pathway so that they know. And only completely incompetent officers would make this stop. We have case law that's slightly different, that's pointing them in different directions. We have attorneys pointing them in different directions. And so for those reasons, these officers are entitled to immunity. We request that the summary judgment decision be reversed and that summary judgment be entered in favor of the city and the officers. Thank you so much for your time. Thank you, counsel. Thank you, counsel, for both parties for the argument you've provided to us today in supplementation to the briefing. And we will consider the case and render a decision in due course. Thank you.